Law v. Department of Mental Health
*[Cite as 7 AOA 428]*

*Case No. 89AP-810*
*Franklin County, (10th)*
*Decided September 25, 1990*

*Jacqueline M. Boney and Margaret J. Lockhart, Cooper, Straub, Walinski & Cramer, for Appellant.*

*Anthony J. Celebrezze, Jr., Attorney General, and Susan M. Sullivan, for Appellee Ohio Department of Mental Health.*

REILLY, P.J.

This is an appeal from a judgment of the Court of Claims in favor of defendant. Plaintiff advances two assignments of error:

"I. The trial court's ruling is contrary to the manifest weight of the evidence.

"II. The trial court erred in deciding the issue of proximate cause without affording plaintiff the opportunity to offer proof."

Defendant asserts a cross-assignment of error, pursuant to R.C. 2505.22, in the interest of preventing reversal:

"The trial court erred in finding appellant's expert qualified to testify pursuant to Evidence Rule 601(D) and R.C. 2743.43."

Plaintiff was admitted to Toledo Mental Health Center on January 29, 1987 as an involuntary patient, pursuant to R.C. 5122.10. The mental health center is a psychiatric hospital operated by defendant, Ohio Department of Mental Health.

Plaintiff remained at the hospital until February, 12, 1987. On that date, a commitment hearing was held before the probate court of Lucas County, pursuant to R.C. 5122.15. The probate court found that outpatient care was the least restrictive, available, alternative consistent with public safety and the treatment goals developed for plaintiff. Thus, plaintiff was immediately discharged from the hospital. Just hours after this discharge, plaintiff attempted suicide by driving her automobile into a quarry. She sustained severe physical injuries.

Plaintiff filed this tort action, alleging that defendant, through its agents, committed several breaches of duty towards plaintiff. Specifically, plaintiff alleged that defendant did not adequately evaluate plaintiff, that defendant did not suitably treat plaintiff, and that defendant did not sufficiently present evidence to the probate court demonstrating that plaintiff required inpatient hospitalization.

The court bifurcated the trial in several respects. The first judge assigned to the case ordered that damages were to be tried at a separate hearing. Then, apparently counsel agreed to further bifurcate the case, as the issue of proximate cause was also to be tried in a separate hearing. It appears the parties understood that at the hearing on liability, the parties would restrict their cases to the evidence involving events which occurred up to the time of the probate court hearing. The second judge assigned to the case reluctantly acquiesced, stating in effect that to the extent that he could, he would confine his liability determination to the evidence presented.

After the hearing on liability, the trial court issued a decision and entered judgment for defendant. The trial court found that plaintiff had not established by a preponderance of the evidence that defendant's treatment of plaintiff fell below the contemporary standards of psychiatric practice. The court found that defendant could not have reasonably foreseen plaintiff's attempt to take her own life. The court also noted that defendant recommended to the probate court that plaintiff should remain in defendant's care.

In the first assignment of error, plaintiff contends that the trial court's ruling is against the manifest weight of the evidence. Specifically, plaintiff argues that the evidence does not support the trial court's conclusion that defendant adequately treated plaintiff.

A reviewing court should not reverse a decision of the trier of fact on the manifest weight of the evidence if there is some competent and credible evidence to support the decision. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St. 3d 77. The trial court is best able to view the witnesses, observe their demeanor, and use these observations to assess the credibility of the evidence. *Id.*

The Supreme Court held in *Bruni v. Tatsumi* (1976), 46 Ohio St. 2d 127, paragraph one of the syllabus:

"In order to establish a medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such physician or surgeon would have done under like or similar conditions or circumstances and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."

The court has also held in *Littleton v. Good Samaritan Hosp.* (1988), 39 Ohio St. 3d 86, that:

"A psychiatrist, as a medical specialist, is held to the standard of care 'of a reasonable specialist practicing medicine or surgery in that same specialty in light of present day scientific knowledge in that specialty field ***.'" *Id.* at 93 (quoting *Bruni, supra,* at paragraph two of the syllabus).

In this case, the trial court found that the expert testimony presented established that the treatment given to plaintiff did not fall below the contemporary standards of psychiatric practice. Plaintiff challenges this finding on several grounds. First, plaintiff argues that it is undisputed that she needed medication which was not given to her until one day prior to the probate court hearing. Plaintiff contends that the hospital should have given her the necessary medication immediately. Second, plaintiff argues that a lack of informed consent was no justification for the delay in medicating her. Third, plaintiff maintains that her hostility or uncooperativeness was no justification for the delay in medicating her. Finally, plaintiff argues that defendant's choice of the slow-acting medication which was eventually given to her was inappropriate and inadequate under the circumstances.

As the trial court noted, the following facts were undisputed. Plaintiff had a history of mental disorders, including several previous commitments to the mental health center. Plaintiff was admitted to the mental health center after she made threatening telephone calls to her mother. At the time of her admission, she was diagnosed as paranoid schizophrenic with acute exacerbation.

It is undisputed that the primary method of treatment of plaintiff's condition is psychotropic medication. When plaintiff was admitted, she had no medication in her system. Apparently, such medication would have greatly improved plaintiff's condition. Plaintiff, however, did not receive such medication until thirteen days after she arrived at the hospital. On February 11, 1987, one day before the probate court hearing, plaintiff was administered Proxilin Decanoate, a relatively slow-acting drug with long-lasting beneficial effects. During prior episodes of mental disorders, other psychiatrists had treated plaintiff with Proxilin Decanoate, resulting in beneficial therapeutic effect. The initial treating physician, Dr. Masyk, recommended that plaintiff receive Stelazine, a fast-acting psychotropic drug. Defendant did not obtain plaintiff's informed consent for medication until February 11, 1987.

Moreover, it is also unquestionable that the hospital developed a treatment plan for plaintiff and evaluated her condition. Dr. Lenz, the head of the treatment team for plaintiff, testified at the probate hearing. He recommended that plaintiff should remain at the hospital because in his opinion, she could not care for herself as an outpatient.

In its decision, the trial focused on the differing opinions among, the experts who testified. Plaintiff's expert, Dr. Dennis Koson, testified that defendant's failure to medicate plaintiff sooner was contrary to contemporary standards of care. First, he stated that defendant did not adequately evaluate or chart plaintiff's condition in the interdisciplinary progress notes utilized in the field. Further, he indicated that although Proxilin Decanoate was an appropriate pharmacological choice to treat paranoid schizophrenia, it was not appropriate under the circumstances. Dr. Koson said that, even if plaintiff was uncooperative or if she did not consent, drug intervention was warranted at a much earlier time. He stated that some form of quick-acting medication should have been administered, especially since plaintiff had prior violent episodes. He stated that Stelazine should have been given in addition to the Proxilin Decanoate.

Defendant's experts controverted this testimony. Dr. Lenz testified that he performed an adequate examination. He said that plaintiff was hostile and uncooperative, but there was no indication that she was presently dangerous to anyone, including herself. He stated that

plaintiff's behavior caused the delay in medicating her. He stated that he was attempting to establish rapport or trust with plaintiff because in the past, she had a history of distrust and of not taking her medication.

Dr. Howard Sokolov, defendant's other witness, indicated that defendant's evaluation and treatment of plaintiff's condition was reasonable. The doctor said that considering plaintiff's hostility and suspicion, it was difficult to communicate with her. Thus, the treatment team did the best they could to evaluate her condition. The doctor indicated that building trust with the patient was reasonably necessary. Hence, the delay in medicating plaintiff was appropriate under the standard of care. He noted that Proxilin Decanoate was an appropriate choice of medication because it was a drug that plaintiff had success with before. Apparently, the drug in this form, although slow-acting, would last for several weeks.

This long-lasting effect was important because plaintiff had a history of not taking her medication. Moreover, Dr. Sokolov indicated that quick-acting Stelazine was not warranted because there was no indication that plaintiff was dangerous and no anticipation that plaintiff would be released. Further, he stated that it was appropriate to consider the cumulative adverse effects that a combination of Stelazine and Proxilin Decanoate could cause for plaintiff.

Although there is evidence of past violent behavior outside the hospital, and irritability and hostility inside the hospital, there was some evidence that plaintiff had improved at the hospital. Hence, while initially medication seemed warranted, there was a basis for the delay in medicating her. There was no evidence that plaintiff exhibited suicidal tendencies. Plaintiff attempted suicide long ago, but this was not known by the doctors. Plaintiff testified that she had thoughts of suicide at the time in question, but she admitted that she did not communicate this to anyone.

Plaintiff nevertheless disputes the finding that she continually refused medication; yet, there is some evidence to support this conclusion. Thus, there is some evidence that, given plaintiff's hostility, it was appropriate to postpone giving her medication until trust and rapport was established. There was sufficient evidence that standard treatment required the doctors to refrain from forcing medication on the plaintiff.

Moreover, it was not inappropriate for the doctors to postpone trying to obtain informed consent, given the need to establish rapport and considering that no emergency existed. Although it appears that R.C. 5122.27 does not require such consent, it is undisputed that such consent is a state policy. This policy is designed to protect the patient.

Defendant's choice of Proxilin Decanoate is also supported. There was some evidence that plaintiff needed long-lasting medication and that plaintiff had been given this medication before with successful results. Hence, there was expert testimony that this was an appropriate choice. Combining Stelazine with Proxilin Decanoate may have had adverse cumulative effects. Plaintiff's expert testified otherwise, but this was merely a conflict in the evidence which is based on credibility.

Moreover, the evidence is also in conflict on the necessity of "progress noting" certain interactions between the treatment team and plaintiff. Nonetheless, there is some evidence to support the conclusion that defendant conformed with the standard of care. Moreover, it was not established that the events alleged to be overlooked were significant. Further, such notations would not have made a difference as the treatment team appeared to be attuned to plaintiff's needs through other means of communication. In any event, there was some competent, credible evidence to support the trial court's determination.

The first assignment of error is not well-taken.

In the second assignment of error, plaintiff contends that the trial court erred in deciding the issue of proximate cause without allowing plaintiff the opportunity to offer proof.

The transcript shows that the trial court was hesitant to a bifurcate these issues:

"THE COURT. Ordinarily you have to put liability and proximate cause together, so to the extent I can – you have to have some – I understand what you're both saying is you're not going to go beyond the hearing in court?

"MS. BONEY. That's correct.
"MS. SULLIVAN. Correct.
"THE COURT. And the court will rule based on that testimony whether it can dispose of the case; Is that right?

"MS. BONEY. That's correct, your honor.
"MS. SULLIVAN. Correct.
"THE COURT. That's fair enough." (Tr. 9.)

In its decision, after noting that defendant's conduct did not fall below the standard of care, the trial court wrote:

"In addition, it is difficult for this court to imagine that [the hospital] should have reasonably anticipated that its acts or omissions would have led to plaintiff's attempts to end her life. Dr. Sokolov testified that there was no indication that plaintiff was homicidal or suicidal at the time. The court does not believe that the plaintiff's harmful action was foreseeable. *** The court finds that [the hospital] desired to have plaintiff as an inpatient and render additional care -- it was not [the hospital's] recommendation to the probate court to have plaintiff receive outpatient care. The circumstances of this lawsuit are unfortunate, but the court shall not hold [the hospital] liable when there is a lack of proof to show its actions were inappropriate and that plaintiff's suicide attempt was foreseeable."

Plaintiff has not argued that it is an abuse of discretion to bifurcate these issues in all circumstances. Instead, plaintiff contends that she was prevented from offering proof because the trial court indicated that it would not go outside the scope of the bifurcation. There indicated was no error in this case because the court's decision was in accordance with the bifurcation.

First, as the court noted, it is difficult to separate the intertwined issues of duty and proximate cause. He indicated that he would do so if he could. Hence, plaintiff was on notice that she should present evidence necessary for her case. Moreover, there was evidence presented about past suicide attempts. Dr. Sokolov testified about this without objection from plaintiff.

Although the foreseeability of suicide could have been heard at a proximate cause inquiry, the facts of this case show that it was incumbent on plaintiff to present such evidence. For plaintiff argued that her serious condition warranted immediate drug intervention because she was dangerous to others and possibly herself.

Nevertheless, the court's decision does not rest on this ground. The decision indicates that, even if defendant was negligent, the injury was not foreseeable. As such, it was dictum or an alternative basis. This is a reasonable construction because the court determined that defendant was within the standard of care and "in addition," plaintiff's injury was not foreseeable.

The second assignment of error is also not well-taken.

In the cross-assignment of error, defendant contends that the trial court erred in finding plaintiff's expert qualified to testify pursuant to Evidence Rule 601(D) and R.C. 2743.43.

The disposition of the first and second assignments of error requires affirmance of the trial court's decision, but, for the purpose of passing on this assignment of error, we note the following. R.C. 2743.43(A) provides:

"No person shall be deemed competent to give expert testimony on the liability issues in a medical claim, as defined in division (D)(3) of Section 2305.11 of the Revised Code, unless:

"***

"(2) Such person devotes three-fourths of his professional time to the active clinical practice of medicine or surgery, osteopathic medicine and surgery, or podiatric medicine and surgery, or its instruction in an accredited university."

See *McCrory v. State* (1981), 67 Ohio St. 2d 99, and *Levin v. Hardwig* (1979), 60 Ohio St. 2d 81, for interpretation of this provision.

Evid. R. 601 similarly provides:

"Every person is competent to be a witness except:

"***

"(D) A person giving expert testimony on the issue of liability in any claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnoses, care or treatment of any person, unless the person testifying *** devotes three-fourths of his professional time to the active clinical practice in his field of licensure, or to its instruction at an accredited university."

Defendant argues that plaintiff's expert, Dr. Koson, did not devote three-fourths of his professional time to the active clinical practice of psychiatry. Instead, defendant characterizes Dr. Koson as a professional medical witness who does not engage in clinical practice at all.

The evidence establishes that Dr. Koson is licensed to practice psychiatry. He has been engaged in private practice and has taught this specialty at Harvard University, and he has been an adjunct professor of law at a law school in Florida, apparently teaching law and psychiatry related topics.

At any rate, in the recent past, Dr. Koson has served in various litigation contexts. He has

served in several prison litigation cases to gauge compliance with court orders requiring psychiatric care. For instance, he serves as an adjunct to a federal court master. His role is to assess whether proper care is being given to patients. This includes monitoring the entire system for proper delivery of care and services, and consultation on the appropriateness of the care being provided. In this context, he assesses individual patients, the care being given them, to some extent the personnel involved and, as mentioned, the entire system.

Defendant contends that because Dr. Koson does not spend three-fourths of his time making treatment decisions based on face-to-face contact with patients, he is incompetent to testify. Defendant refers to the trial court's decision wherein the court wrote that even though the doctor only spent twenty-five percent of his time treating patients, the rest of his time was consultation.

The consultation the court was referring to consisted of monitoring the services that others were performing. This included evaluating patients, records and treatments. It also included recommendations of treatment and diagnosis.

Neither R.C. 2743.43 nor Evid. R. 601(D) requires that a doctor be engaged in private clinical practice in order to be able to testify. In *Levin, supra,* the Supreme Court held that a doctor performing examinations for the Veteran's Administration Disability Adjudication Board was competent to testify under R.C. 2743.43. Similarly, in *McCrory, supra,* the court held that a physician/director of clinical research at a pharmaceutical company was competent to testify under R.C. 2743.43, recognizing that certain adjunct medical personnel are competent to testify.

Considering Evid. R. 601(D), this court has recognized that "*** [t]he purpose of the restriction on expert testimony is to discourage, as far as possible, testimony regarding the proper standard of care by professional witnesses or a physician who is sequestered in a laboratory and has no first-hand knowledge of the daily care of patients. ***" *Wise v. Doctors Hospital North* (1982), 7 Ohio App. 3d 331, 334. See, also, *McCrory, supra,* at 103.

It cannot reasonably be contended that Dr. Koson did not have first-hand knowledge of the daily standard of care such that it would render it unfair for him to testify. Courts throughout the country have appointed him to assess whether the daily standard of care was being delivered to patients. Moreover, his practice and consultation activities definitely fall within the parameters of *Levin, supra.*

Defendant's cross-assignment of error is not well-taken.

Plaintiff's assignments of error and defendant's cross-assignment of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH and YOUNG, J.J., concur.